**SACK & SACK, ESQS.**
Jonathan S. Sack, Esq. (JSS 1835)
Eric R. Stern, Esq. (ERS 1918)
135 East 57th Street, 12th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

FELICIA ALLEN,

                Plaintiff,

— against —

**SKANSKA AB, SKANSKA USA, SKANSKA USA BUILDING, INC.** and **SLATTERY SKANSKA, INC.**,

                Defendants.

------------------------------------------------------------------ x

*Judge Hellerstein*

04 CV 09593 Index No.

ECF CASE

COMPLAINT

JURY TRIAL REQUESTED

RECEIVED DEC - 7 2004 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, FELICIA ALLEN ("*Allen*" or "*Plaintiff*"), by her attorneys, Sack & Sack, Esqs., as and for its complaint, alleges as follows:

## NATURE OF ACTION

1. Plaintiff complains that her former employer, Defendants Skanska AB, Skanska USA, Skanska USA Building, Inc. and Slattery Skanska, Inc. ("*Defendants*" or "*Slattery*") engaged in the unlawful ("quid pro quo" and hostile work environment) sexual harassment, discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon her sex,

female.

2.      Plaintiff further complains that Defendants engaged in the unlawful discrimination and retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of New York State New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon her sex, female.

3.      Plaintiff further complains that Defendants engaged in discriminatory conduct by subjecting Plaintiff to "quid pro quo" sexual harassment in that she was subjected to a constant barrage of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact and sexual advances, ultimately culminating in forced Rape by her supervisor, Jose Sanpedro ("*Mr. Sanpedro*") in violation of Federal, State and City Human Rights laws.

4.      Plaintiff further complains that Defendants engaged in discriminatory conduct by subjecting Plaintiff to hostile work environment sexual harassment consisting of a constant barrage of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact and advances thereby creating, participating, fostering, and condoning a sex-based hostile work environment in violation of Federal, State and City Human and Civil Rights laws.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

6.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).

7.  This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

8.  Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

## PARTIES

9.  Plaintiff, Felicia Allen, is a female citizen of the United States and is a resident of the State of New York, City of New York, County of Bronx.

10. Throughout her employment with Defendants, Plaintiff has resided at 920 Prospect Avenue, Apartment #6-E, Bronx, New York 10459. From June 1, 2004 to present date, Plaintiff resides at 832 East 165th Street, Apt. # 1, Bronx, New York 10459.

11. From June 7, 2001 through her unlawful discriminatory and retaliatory termination on January 14, 2004, Plaintiff was employed by Defendants first as an apprentice carpenter and then as a

fully licensed Journeyman.

12.    At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, *et seq.*, § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of her sex, female.

13.    Defendants are corporations based in Whitestone, New York with an address of 16-16 Whitestone Expressway, Whitestone, New York 11357-3045, and are duly authorized and licensed to do business in the State of New York.

14.    Since its founding in 1926, Slattery is a full service construction company for corporate, institutional and government clients performing and managing large scale construction services on projects, including railway, roadway, bridge, tunnel, environmental and power generation.

15.    At all times relevant herein, Defendant Slattery is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

## FACTS[1]

The claims set forth herein arise from the following set of facts:

16.    The Plaintiff in this action has undergone disparate, humiliating and degrading treatment by Defendants and their representative management, who treated Plaintiff like a personal sex slave and eventually retaliated against her when she found the courage to fight back. Defendants' acquiescence of

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

4

the discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact and advances engaged in by its representative management, followed by Defendants' retaliatory, surreptitious and unsubstantiated termination of Plaintiff after her lawful complaints, are unequivocal evidence of Defendants' utter and gross disregard of the Federal, State and City laws and guidelines and Defendants' lack of respect for other human beings, taking advantage of the fact that the Plaintiff is a single Black African-American female and mother of two (2) children, employed in the carpenter's skilled construction trades, a profession that is made up of predominantly Caucasian males.

## BACKGROUND OF PLAINTIFF

17. Plaintiff was employed by Defendants from June 7, 2001 through January 14, 2004.

18. Plaintiff was born on September 26, 1960, and is currently 44 years of age.

19. Plaintiff is a single mother with two children - a daughter, age 22, and a son, age 13.

20. Plaintiff's daughter is an honors student at Border College in Atlanta, Georgia, and Plaintiff's son attends Saint Simon Stock School, a private school in Bronx, New York. Plaintiff pays full tuition for both children's private-school educations.

21. Plaintiff is a Certified Carpenter, duly licensed by the New York City District Council of Carpenters.

22. In or about June, 2002, Plaintiff received her Carpenter Certification upon her graduation from the New York City District Council of Carpenters Labor and Technical College.

23. Since November 3, 1997, Plaintiff has been and continues to be a member in good standing of the United Brotherhood of Carpenters and Joiners of America, Local No. 157.

### PLAINTIFF'S EMPLOYMENT HISTORY WITH DEFENDANTS

24. On or about June 7, 2001, Plaintiff became employed at Slattery as an apprentice carpenter.

25. Upon her hire, Plaintiff was assigned to work at the Airrail Project for the construction of the AirTrain at John F. Kennedy Airport (the "*JFK Light Rail Site*"), which opened in December, 2003.

26. At the time of her hire, Plaintiff earned a salary of $28.00 per hour as an apprentice carpenter. Plaintiff worked from 7:00 a.m. to 3:30 p.m., Monday through Friday, with sporadic overtime at a rate of time and a half ($42.00 per hour).

27. In or about June, 2001, upon her hire, Plaintiff's direct supervisor was Jose Sanpedro ("*Mr. Sanpedro*"), the foreman of the JFK Light Rail Site.

28. Mr. Sanpedro is also known as "Chico."

29. Mr. Sanpedro is of Spanish origin, currently about 43 years old, is married and lives with his wife and two (2) children in the State of New Jersey. At the time of Plaintiff's retaliatory termination, Mr. Sanpedro had worked for Defendants for approximately nine (9) years.

30. As foreman of the JFK Light Rail Site, Mr. Sanpedro had the authority, ability and responsibility to decide who was going to work which assignments, how many workers (carpenters) would work on a particular job, and whether the job required more people or fewer people to

6

accomplish a specific task. In other words, as foreman, Mr. Sanpedro had the authority to assign easy or difficult tasks, hire, fire, promote and discipline employees, including Plaintiff.

31.    Even though he was a foreman who was in charge of Plaintiff and her co-workers, Mr. Sanpedro never received any formal or informal training or attended any type of workshop or classes with respect lawful conduct in the workplace, specifically in the area of sexual harassment and discrimination.

32.    Roger Olsen ("*Mr. Olsen*") is the Superintendent of the JFK Light Rail Site. Accordingly, Mr. Olsen is Mr. Sanpedro's supervisor and boss. Mr. Olsen is the only employee of Defendants who maintains an office at the JFK Light Rail Site. His office is located in the Warehouse (as defined below).

33.    At the time of Plaintiff's hire, there were approximately fifty (50) carpenters under Mr. Olsen's supervision. Plaintiff was the only female carpenter.

34.    Mr. Sanpedro was responsible for the hiring, firing, promotion, disciplining and supervision of all of the carpenters at the JFK Light Rail Site, including Plaintiff.

35.    Herman Taylor ("*Mr. Taylor*") is the Shop Steward for the United Brotherhood of Carpenters and Joiners of America. Mr. Taylor works onsite at the JFK Light Rail Site and is an employee of Slattery. Mr. Taylor was responsible for all carpenters (apprentices and journeyman) at the JFK Light Rail Site.

36.    The JFK Light Rail Site had one warehouse, Number 215 (the "*Warehouse*"), where all the materials and hardware for the carpenters at the JFK Light Rail Site are stored. The Warehouse is in

7

a secluded location, fully one mile from any work area at the JFK Light Rail Site.

37.     The Yard (the "*Yard*") is where heavy-duty materials, including scaffolding, vehicles, trucks and columns are kept. Like the Warehouse, the Yard is also located in a secluded location, about one mile from any work area at the JFK Light Rail Site.

38.     As a carpenter apprentice, Plaintiff was responsible for working under the licensed carpenters, performing a variety of duties, which included, but were not limited to, excavation and foundation work, concrete work, construction of concrete walls and any other duty that required assistance from the carpenters.

39.     At the time Plaintiff became employed at Defendants, Plaintiff was attending New York City District Council of Carpenters Labor and Technical College, in the weekday evenings from 5:00 p.m. to 9:30 p.m.

40.     From June 7, 2001 through June, 2002, Plaintiff remained an apprentice carpenter at Defendants.

41.     In or about June, 2002, upon Plaintiff's graduation from New York City District Council of Carpenters Labor and Technical College, Plaintiff became a licensed Journeyman, ***the only female in that classification of job title at the JFK Light Rail Site***.

42.     As a licensed carpenter at the JFK Light Rail Site, Plaintiff maintained the same responsibility she did as an apprentice, except Plaintiff did not require any supervision.

43.     In or about June, 2002, upon Plaintiff's becoming a licensed Journeyman, Plaintiff's compensation increased from $28.00 per hour to $37.00 per hour.

8

44. On or about the January 7, 2002, as a result of poor weather conditions that made it difficult for many carpenters to complete their assignments, Plaintiff was laid off and informed that she would return as soon as the weather allowed the carpenters to continue outdoor construction assignments on the JFK Light Rail Site. For the following three and one half (3½) months, Plaintiff remained unemployed and collected New York State Unemployment Insurance benefits at a rate of $405.00 per week, for a total of approximately $5,670.00.

## PLAINTIFF IS SEXUALLY HARASSED

45. On April 21, 2003, Plaintiff returned to the JFK Light Rail Site following an approximate three (3) month hiatus. From April 21, 2003 and continuously for two (2) weeks thereafter, Plaintiff's foreman and supervisor, Mr. Sanpedro abused his position of authority and power over Plaintiff to engage her in a most humiliating, egregious and intolerable form of sexual discrimination and harassment, which included discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact, advances and abuse, for which there is no legitimate business justification.

46. As Plaintiff's supervisor and boss, Mr. Sanpedro was able to easily order Plaintiff to be in certain areas of the JFK Light Rail Site location out of eyesight or ear shot from any potential witnesses to his abuses.

47. As Plaintiff's supervisor and boss, Mr. Sanpedro could determine when, where and how Plaintiff would carry out her hired duties while working on the JFK Light Rail Site.

48. The veracity of the following allegations are confirmed by Mr. Sanpedro's tape-recorded

9

admissions to Plaintiff following the culmination of the horrific sexual abuse Plaintiff was forced to endure under the express threat of losing her gainful employment with Defendant. An accurate transcript of Mr. Sanpedro's tape recorded admissions is included in the facts of this Complaint.

49. Even though Plaintiff worked with Mr. Sanpedro prior to April 21, 2003, she never encountered any incidences or harassment or abuse. However, that is not to say that Mr. Sanpedro did not engage in inappropriate unlawful sexual discrimination or harassment before April 21, 2003.

50. Upon information and belief, Mr. Sanpedro did have an inappropriate relationship with another carpenter known as "Cookie" immediately prior to Plaintiff's return to work to the JFK Light Rail Site on April 21, 2003.

51. Upon information and belief, Mr. Sanpedro's decision to call Plaintiff back to work in April 2003 was a direct result of Cookie's departure from the JFK Light Rail Site. At that time, Mr. Sanpedro could focus his "interests" on Plaintiff.

### DAY 1
### MONDAY, APRIL 21, 2003

#### MR. SANPEDRO ENGAGES IN UNWARRANTED TOUCHING

52. On Monday, April 21, 2003, as a result of warm weather, Plaintiff, who had been called back to work, returned to work at the JFK Light Rail Site promptly at 7:00 a.m.

53. On April 21, 2003, that same first day back to work at the JFK Light Rail Site, Plaintiff was greeted by Mr. Sanpedro who said, **"Hey, Felicia. You look *fine*! You lost weight. Your hair looks great. *Um ummm*, you look good!"**

10

54.     On April 21, 2003, that same day, at approximately 9:15 a.m., Mr. Sanpedro ordered Plaintiff to ride with him to the Warehouse to retrieve some materials. Mr. Sanpedro and Plaintiff were the only two people at the Warehouse. Mr. Sanpedro told Plaintiff to retrieve some "two-by-fours." As Plaintiff walked past Mr. Sanpedro towards the Warehouse to fetch the wood, Mr. Sanpedro uninvitingly patted Plaintiff on her buttocks with his hands.

55.     Upon Plaintiff's walk from the Warehouse back towards the truck, as Plaintiff was using both of her hands to balance the "two-by-fours" on her shoulder (in accordance with Mr. Sanpedro's orders and instructions to her), Mr. Sanpedro approached Plaintiff and without Plaintiff's consent, rubbed his hand up and down Plaintiff's vaginal area over Plaintiff's pants. (Plaintiff was unable to deflect his hand or move herself away from him because she was stabilizing the wood on her shoulder.)

56.     After these two incidents, Plaintiff grew extremely anxious, nervous and uncomfortable but was too scared to say anything in protest to Mr. Sanpedro, as it was her first day of work after a four-month hiatus and she was the only female Journeyman at the JFK Light Rail Site. Plaintiff had hoped that Mr. Sanpedro's inappropriate behavior was an isolated incident and would not continue.

## DAY 2
## TUESDAY, APRIL 22, 2003

### MR. SANPEDRO ENGAGES PLAINTIFF IN UNWARRANTED KISSING AND GROPING

57.     On or about Tuesday, April 22, 2003, Plaintiff's second day back at the JFK Light Rail Site, Plaintiff reported to the Foch Boulevard location at the JFK Light Rail Site to receive her daily assignment from Mr. Sanpedro. At that time, Mr. Sanpedro directed Plaintiff towards a low hollow concrete column that was located away from the other employees and asked her to bend down so he could show Plaintiff the work in the column he was assigning her to do that day.

11

58.     While Plaintiff bent down to look into the confined space of the column, Mr. Sanpedro bent down with her and, without Plaintiff's permission or consent, kissed Plaintiff on her mouth, stuck his tongue in her mouth and touched her throat with his tongue.

59.     Despite the snugness of the space, Plaintiff managed to push Mr. Sanpedro away and in a defiant tone, Plaintiff immediately instructed Mr. Sanpedro to stop kissing her.

60.     In response, Mr. Sanpedro just smirked, grunted and walked away.

61.     Once again, because she had just returned to the JFK Light Rail Site and was scared to risk jeopardizing her position of employment, assignment, or the loss of her job, Plaintiff decided not to approach Mr. Sanpedro to discuss his inappropriate actions.

## DAY 3
## WEDNESDAY, APRIL 23, 2003

### MR. SANPEDRO THREATENS PLAINTIFF'S CAREER

62.     On or about Wednesday, April 23, 2003, Plaintiff's third day back at the JFK Light Rail Site, at approximately 10:00 a.m., while Plaintiff was standing at the Foch Boulevard entrance to the JFK Light Rail Site, Plaintiff's friend, Arnold Dow ("*Arnold*"), drove by the site. When Arnold saw Plaintiff, he stopped his vehicle to say hello. Plaintiff and Arnold were exchanging pleasantries when Mr. Sanpedro interrupted the two of them and screamed at Arnold, **"Get out of here! She's mine! Go off and get your own woman!"**

63.     Upon hearing Mr. Sanpedro's remarks, Plaintiff replied to Mr. Sanpedro, **"Arnold is my friend, and I am not your woman."** Mr. Sanpedro responded, **"Excuse me?**

12

**Don't you want that job at Poletti Power Plant?[2] And don't you want to stay on the job long enough to buy that house you've always wanted?"**

64. Plaintiff tried to explain to Mr. Sanpedro that Arnold was the individual responsible for getting her a job at Slattery, and Plaintiff wanted to thank him. Mr. Sanpedro responded by threatening, **"He mayhave gotten you here, but just remember who's keeping you here. And don't you fucking forget it, sweetheart."**

**DAY 4**
**THURSDAY, APRIL 24, 2003**
<u>**MR. SANPEDRO FORCES PLAINTIFF TO EXPOSE HERSELF**</u>

65. The following day, on or about Thursday, April 24, 2003, Plaintiff's fourth day back at the JFK Light Rail Site, at approximately 2:00 p.m., Mr. Sanpedro ordered Plaintiff to accompany him to the Yard to retrieve some scaffolding. Plaintiff and Mr. Sanpedro traveled alone to the Yard in the company van.

66. When Plaintiff and Mr. Sanpedro arrived at the Yard, Mr. Sanpedro stepped out of the van, walked to the passenger side, opened the passenger side door where Plaintiff was sitting and told Plaintiff to move into the back of the van. Plaintiff thought that Mr. Sanpedro had wanted her to go to the back of the van in order to clear the van and make room for the scaffolding.

---

2 Mr. Sanpedro was referring to the next big job at Poletti Power Plant ("*Poletti*"). It is well known amongst the New York City Council of Carpenters (and by Mr. Sanpedro) that Poletti was a multi-million dollar job and the most sought after job by union workers because of the long-term need for Carpenters on this large scale job site.

13

67.     When Plaintiff stepped into the rear of the van to start clearing some of the materials, Mr. Sanpedro demanded, **"Pull down your pants and your panties."** Plaintiff looked at him and responded, **"*What?* Are you kidding?"**

68.     Mr. Sanpedro looked at her sternly and said, **"I'm not kidding. Remember our conversation yesterday [when Mr. Sanpedro threatened terminating Plaintiff if she did not comply with him]. Hurry up!"** Alone, afraid, and scared of the consequences she might face for refusing his orders, Plaintiff complied in a defeated, halting fashion. Plaintiff was devastated and humiliated by having to expose herself to Mr. Sanpedro against her wishes. Mr. Sanpedro's unwelcome demands are not in any way related to Defendants' business and do not further its interests in the construction of the JFK Light Rail Line.

69.     As ordered, Plaintiff pulled her pants and underwear down to her knees.

70.     Mr. Sanpedro leered hungrily at Plaintiff's vagina. With a lecherous grin, Mr. Sanpedro ordered, **"Open your legs!"** At that time, Mr. Sanpedro, forcibly inserted his finger inside

### MR. SANPEDRO SHOWS PLAINTIFF HIS PENIS

73. After Plaintiff loaded the scaffolding into the van, Plaintiff returned to the passenger seat of the van. As they got ready to drive back to the worksite, Mr. Sanpedro said to Plaintiff, **"Felicia, remember our conversation yesterday. I put you to work, I could put you out of work. And one more thing..."**

74. Mr. Sanpedro then proceeded to unbutton his jeans and remove his penis from his pants. It was in an erect state. Sexually aroused, Mr. Sanpedro then said, while holding his erect penis, with his right hand, **"Look at my dick. It may be short, but it is nice."** Plaintiff looked away, but Mr. Sanpedro demanded, **"Look at it, damn it!"** Terrified, Plaintiff hesitantly turned back and looked at it.

75. Mr. Sanpedro's penis is not more than five (5) inches long in the erect state and is uncircumcised. After about thirty (30) seconds, but which time seemed like an eternity to Plaintiff, Mr. Sanpedro put his penis back in his pants and drove Plaintiff back to the worksite.

76. Recalling the day's events, Plaintiff was frightened of what could have happened that day or what may happen tomorrow. Plaintiff very much wanted to get through the week without being hurt, abused or fired.

### DAY 5
### FRIDAY, APRIL 25, 2003

### MR. SANPEDRO MAKES PLAINTIFF FEEL HIS PENIS

77. On or about Friday, April 25, 2003, Plaintiff's fifth day back at the JFK Light Rail Site,

Mr. Sanpedro asked Plaintiff to accompany him to the Yard once again. Seeing that Plaintiff was hesitant and scared, Mr. Sanpedro assured her, **"This time, I'm not going to touch your pussy."** Hesitant, Plaintiff reluctantly accompanied him to the Yard in the hopes that no further abuse would occur.

78. As they rode alone in the van toward the Yard, Plaintiff had an ominous dread of what Mr. Sanpedro would order her to do. Mr. Sanpedro explained to Plaintiff how his wife recently had a heart attack at age 40 and that **"I am in need of a good ol' fucking."**

79. At that time, Mr. Sanpedro took Plaintiff's hand and with his hand on top of hers, he forcefully put Plaintiff's hand on top of his pants and made her rub his penis and testicles. Plaintiff resisted and tried to pull her hand back, but to no avail.

80. Mr. Sanpedro made sure that Plaintiff felt that his penis was erect, as he said, **"You see how you get me, Felicia – hard, baby."**

81. On their drive back from the Yard, Mr. Sanpedro laughed, **"Ha ha, I told you I wasn't going to touch your pussy."**

82. Plaintiff was terrified and felt incredibly helpless in the position she now found herself to be in.

### DEFENDANTS HAVE NO POLICIES IN PLACE AT THE JFK LIGHT RAIL SITE WITH RESPECT TO THE TYPE OF ABUSE PLAINTIFF WAS SUFFERING

83. At the end of her first week back at the JFK Light Rail Site, Plaintiff realized that despite

16

her hard work and credentials, her career had taken an awful turn merely because she was a female.

84. Plaintiff sat down with her kids for dinner that Friday night and all Plaintiff could think about was what would be of their futures if Plaintiff had stopped working or complained about Mr. Sanpedro's abuses.

85. All Plaintiff could think about was Mr. Sanpedro's recent, real and express threat, **"I put you to work, I could put you out of work."**

86. Plaintiff was extremely nervous and afraid that after being out of work for over four (4) months, she may be faced with another loss of income if she protested the unwanted abuse and molestation by Mr. Sanpedro.

87. Plaintiff reasonably believed that any complaint would result in retaliation, including being fired from her gainful employment with Defendants.

88. Plaintiff was never informed of Defendants' procedures or policies with respect to the type of unwanted and unwarranted abuse she was suffering. Plaintiff was scared for her job, her children and herself.

89. Defendants did not publish, disseminate, communicate or post any company policy with respect to sexual harassment, discrimination or the process of lodging a complaint of any other unlawful conduct, including workplace health and safety at the JFK Light Rail Site.

91. Defendants do not maintain any human resources or equal employment opportunity office at the JFK Light Rail Site.

92. Plaintiff, throughout her tenure at the JFK Light Rail Site, never saw or knew of any human resources or equal employment office at the JFK Light Rail Site.

93. Defendants do **not** maintain proper training and controls regarding employee safety.

94. Defendants did not properly train its management, who was left in charge of managing, hiring, firing and promoting employees at the JFK Light Rail Site, regarding policies concerning sexual harassment, discrimination or any other unlawful conduct.

95. Plaintiff was not properly informed of her rights and remedies in the event of egregious sexual harassment.

### SHOP STEWARD OFFERS NO ASSISTANCE

96. On Monday, April 28, 2003, Plaintiff's sixth day back at the JFK Light Rail Site, after some serious thinking, Plaintiff decided to return to work with the hope that Mr. Sanpedro's sexual and physical abuse would cease.

97. Despite the lack of safeguards, policies, published posters, procedures and other safety precautions with respect to sexual harassment, discrimination and other unlawful conduct at JFK Light Rail Site, Plaintiff needed to know if there was anything that could be done to stop the abuse she was suffering at the hands of her manager without having Mr. Sanpedro fire her in retaliation.

98. Accordingly, on April 28, 2003, while driving into work, Plaintiff called Mr. Taylor, the

Shop Steward, on her cellular phone.

99. Plaintiff asked Mr. Taylor, "Hypothetically speaking, if a member of the union was being sexually harassed against her will, what is the procedure?"

100. Mr. Taylor responded, "Hypothetically, I would get both parties together to try to resolve the problem and then I would have to bring it to the attention of Mr. Olsen, the Superintendent. I can't talk about this now, Felicia." Mr. Taylor then abruptly hung up the phone.

101. Plaintiff believed Mr. Taylor knew exactly what she was talking about. Mr. Taylor did not ask Plaintiff if she knew who this person was, if this person worked at the JFK Light Rail Site, if this person was a friend of Plaintiff's or if this person was Plaintiff herself. Furthermore, Mr. Taylor did not question Plaintiff about the aggressor or mention any punishment that the aggressor may be subject to. Furthermore, Mr. Taylor did not mention anything about formal policies, procedures, safeguards, equal employment office or representative.

102. From Mr. Taylor's response and his abrupt manner and tone, it was Plaintiff's sincerest belief that if she were to report Mr. Sanpedro's acts to Mr. Taylor at that time, he would "sweep it under the rug" and/or side with Mr. Sanpedro. Plaintiff reasonably believed she would be fired in retaliation for her complaint.

## DAY 6
## MONDAY, APRIL 28, 2003

### MR. SANPEDRO CONTINUES TO PHYSICALLY AND SEXUALLY HARASS AND ABUSE PLAINTIFF

103. On Monday, April 28, 2003, Plaintiff's sixth day back at the JFK Light Rail Site, upon Plaintiff's arrival at the JFK Light Rail Site and after Plaintiff had spoken to Mr. Taylor, Plaintiff was

met by Mr. Sanpedro who told her to come into the waiting van to drive to a new location at the JFK Light Rail Site. Plaintiff entered the van with great trepidation.

104. Plaintiff was once again terrified that Mr. Sanpedro will once again attempt to touch, molest, abuse or otherwise engage Plaintiff, against her will and without her consent, in some form of unwarranted physical contact or advances.

105. While in the van, Mr. Sanpedro stopped the vehicle, at which time Plaintiff hoped he was going to describe Plaintiff's daily assignment. Instead, Mr. Sanpedro lunged toward Plaintiff and kissed her on her mouth without Plaintiff's consent. When he kissed her, he forced his tongue into her mouth.

106. At that time, while kissing Plaintiff without her consent, Mr. Sanpedro put his hands on Plaintiff's breasts and groped them repeatedly.

107. When he kissed her, Plaintiff attempted to turn away and resist Mr. Sanpedro's advances. In attempting to do so, Plaintiff's head hit the passenger door window and Plaintiff became momentarily dazed and confused. Aching from the bang to her head, Plaintiff pushed Mr. Sanpedro away and unequivocally ordered him, **"Stop! Enough!"**

108. Without saying anything further, Mr. Sanpedro returned to the driver's seat and continued driving to the site.

109. As he drove, not only did Plaintiff begin to visibly cry, but Plaintiff suffered from a throbbing migraine for the rest of the day as a result of the impact of Plaintiff's head hitting the window.